|    |     |
|----|-----|
| 28 | 227 |
| 31 | 118 |

## TIM. REAGAN v. THE STATE.

### *No. 3261.   Decided November 27.*

1. **Attempt to Rape—Indictment.**—It is not essential that an indictment in charging an attempt to rape by threats alone, shall allege specifically that the threats were directed against the person of the injured female.

2. **Same.**—It is contended on this appeal that a conviction for attempt to rape can be had only under an indictment for rape.   But *held* that the contention is without merit.

3. **Same—Duplicity** is an objection which applies to an indictment in which two or more distinct offenses are joined in a single count, and not to an indictment such as that in this case, wherein the offenses are alleged in separate counts.

4. **Practice—New Trial.**—The record discloses that one D., a witness subpœnaed for the defense, was in attendance upon the court until August 1; that none of the witnesses in the case being present on August 2, they were attached; that when the parties were called upon to announce, the sheriff stated to the counsel for the defense that D. was under attachment, and would appear to testify, but that in fact the said witness did not appear and testify.   The defense, after verdict, brought forward this matter as cause for new trial, setting out the facts expected to be proved by D.   *Held*, that the court did not err in refusing the new trial upon this showing.   The proper practice in the premises was for the defense, upon discovering that the absent witness would not be present upon the trial, to move for a withdrawal of its announcement, and for a continuance or postponement of the trial.

5. **Same—Newly Discovered Evidence.**—Evidence which, if not known to the defendant, was accessible by the use of diligence, and which could have been obtained from other sources than that stated in the motion for new trial, does not come within the category of newly discovered evidence.

6. **Attempt to Rape—Intent—Drunkenness—Charge of the Court.**—The spe-

cific intent to ravish is an essential ingredient of the offense of attempt to rape; and although the accused, in making the attempt, may have used the means to effect rape, he is not guilty of attempt to rape unless his use of said means was accompanied by the specific intent to rape. Evidence, therefore, which tended to show that when he made the attempt, the accused was excessively drunk, fairly raised the question of his mental capacity to conceive the criminal intent, and demanded of the trial court a charge to the effect that in determining whether the accused had the specific intent to rape at the time he made the attempt, the jury should take into consideration the evidence of the drunkenness of the accused, and his consequent mental capacity to form such intent. A special instruction embodying this principle, and responding to evidence on the trial, was erroneously refused. See the opinion *in extenso* for the special instruction referred to, and for a discussion of the question.

Appeal from the District Court of Falls. Tried below before Hon. J. R. Dickenson.

The appellant was convicted under the second count of the indictment charging him with an attempt to rape Mary Ann Regian, in Falls County, Texas, on the 28th day of January, 1888. A term of two years in the penitentiary was the penalty assessed against him.

Stated in brief, the evidence shows that the alleged attempt to rape Mrs. Regian was committed in a house on the farm of E. A. Watson, in Falls County, into which Mrs. Regian, her husband, and children had moved on the preceding day. That house, for two years preceding its occupancy by the Regians, had been occupied by two negresses, Ann Roberts and Sallie May, and during their tenancy was reputed to be a house of prostitution.

Mrs. Regian testified for the State, in substance, that her husband went hunting on the night of January 28, 1888, leaving no person at the house but herself and her two small children. She retired about nine o'clock, closing but not locking the door, as she was momentarily expecting the return of her husband. About ten or eleven o'clock the defendant pushed the door open and entered the witness's bedroom. She asked him who he was, but he refused to tell her. She then ordered him to leave, and he refused to go. She then sprang out of bed, when the defendant put his hand first on her arms, then on her dress, and then on her limbs. She broke loose from him and fled from the house, calling her husband by name. Defendant pursued and caught the witness near the woodpile, when he attempted to throw her down, telling her that if she did not yield to his desires he would kill her and her children. Witness again got loose from him and started in a run towards a negro cabin about 200 yards distant. Defendant mounted his horse and again pursued witness, calling to her that if she did not stop, hush up, and yield to him he would shoot her. Witness struck and then dodged the horse, and ran back into her bedroom and closed and locked her door. Defendant returned to the house and attempted to get in at the doors and window, failing in which he called to witness that if she did not open the

door, admit him, and submit to him, he would kill her. About this time the witness's husband returned and ordered defendant to leave, and within a few moments defendant got on his horse and rode off. About twenty-five minutes later he came back, got off his horse and started into the house. Just as he was about to enter the door the witness's husband struck him on the head and knocked him down. He then told defendant to leave. Defendant replied that he could not get up, but after a few minutes he got on his horse and left. Before the witness's escape from the house defendant told her that he had came there to sleep with a woman, and that he had money and whiskey he would give her if she would sleep with him. Witness replied that he had come to the wrong woman, and ordered him to leave. She had never seen the defendant before that night, but her identification of him was complete.

On her cross-examination the witness said that she smelled whiskey on the defendant's breath, but he did not show intoxication either in his voice or movement. When pursuing witness he said that his name was Tim Reagan, and that he would shoot witness if she did not stop and submit to him. Witness saw no pistol, but he said that he had one. .

J. H. Regian testified for the State, in substance, that when he returned to his home between 11 and 12 o'clock on the night of the alleged offense, he found the defendant walking around the house trying to look in. Witness asked him what he was doing there. He replied that he was looking for escaped convicts. Witness replied that he was at the wrong house to look for convicts, and ordered him to get on his horse and leave. He thrust his hand in his bosom and said to witness, "If you have any ends on me, use them." Witness replied that he had no ends, but that he wanted him to leave. Defendant then got on his horse and rode off towards Wiley Jones's house. About two hours later he returned, dismounted, and started into the house. Just before he reached the door witness knocked him down with a hackberry stick. When he recovered from the first effects of the blow, the defendant begged witness "not to shoot him again." Witness ordered him to get up and leave. He replied that he was unable to get up. Witness then helped him on his horse, and he rode off in the direction of Griffin's house. Defendant's breath was strongly impregnated with whiskey, and witness thought he was drunk, though he carried himself erect, and could mount and dismount his horse with ease. The State closed.

M. U. Canterberry testified for the defense that he had charge of the county convicts in January, 1888, and on the evening before the alleged offense gave defendant verbal authority to arrest any escaped convict he could find, giving him descriptions of several. An authorized reward of five dollars per head was then standing for the recapture of escaped convicts. A short time before this alleged offense the witness, indicating the Regian house, then occupied by Ann Roberts as a house of prostitu-

tion, and referring to Sallie May, told the defendant that a good looking yellow girl lived in that house. Defendant replied, "Yes, I called on her when I was riding the mail." Defendant quit "riding the mail" in the spring or summer of 1887. Sallie May was a trim-built, ginger-cake-colored woman, and in many respects resembled a white woman. Witness had known the defendant from his infancy. A very few drinks would make the defendant drunk, and when drunk he was an utter fool, without self-control or discretion, and wholly incapable of distinguishing right from wrong.

T. D. Graffenreidt testified for the defense that he saw the defendant at Griffin's house a few minutes after he received the blow at the hands of Regian, on the night of the alleged offense. The defendant was then very drunk, and he appeared to have but little idea of what he talked about. He said that he was hunting convicts when a long yellow fellow shot him.

Other witnesses for the defense testified that defendant was very drunk on the night of the alleged offense, and corroborated Canterberry as to the effect of whiskey upon the defendant's mental faculties.

The alleged newly discovered testimony upon which the motion for new trial was based, is that contained in the affidavit of Mark Harwell, as follows:

"THE STATE OF TEXAS v. TIM REAGAN—*District Court Falls County, Texas, July Term, 1889.*—Before me, the undersigned authority, on this day personally appeared Mark W. Harwell, well known to me, who being by me duly sworn, deposes and says as follows: I am well acquainted with the defendant in the above entitled and numbered cause, and have known him for the last ten or twelve years, perhaps longer, and I am in no wise related to him. He has been living in Falls County ever since I knew him.

"I am also acquainted with John H. Regian, and have known him and his wife, Mollie Regian, three or four years. Regian and his wife were tenants on my farm on the Brazos River, about four miles west of Marlin, in January, 1888. They moved to my place on the 26th or 27th day of January, 1888. I remember of the difficulty that took place between the defendant Tim Reagan and John H. Regian and wife. I happened to go to T. J. Griffin's house the next morning after said difficulty. Griffin's house was but a short distance from Regian's house, on same place, and while there I heard a conversation between Griffin and Regian with reference to the difficulty between Regian and Tim Reagan, and in the course of this conversation I heard Griffin urge Regian to prosecute Tim Reagan for going to his house and creating a disturbance the night before. Regian expressed himself as being unwilling to prosecute Tim Reagan, because he believed him, Tim Reagan, to have been drunk when he came there, and did not know what he was doing. Griffin insisted that Tim

Reagan was a dangerous man and would hurt Regian when he met him, and continued to advise Regian to report him and prosecute him.

" Regian still persisted that Tim Reagan was drunk and did not know what he was doing, and was mistaken in the house. The house in which Regian and his wife lived on my farm on the Brazos, as aforesaid, had been occupied by an old woman (colored) by the name of Ann, and while she occupied it, it was known as a house of prostitution, and was located near the bank of the river. I have never made this statement to defendant or his father, Judge Reagan, or any one else for them before this trial in the District Court of Falls County at its present session, and did not until several days after his trial. I made it known to Judge Reagan, the father of defendant.

" MARK HARWELL."

*Goodrich & Clarkson,* and *W. Shelton,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

HURT, JUDGE.—This is a conviction for an attempt to rape.

There are two counts in the indictment. The first charges an assault with the intent to commit rape. The second charges an attempt to commit rape. The first is sufficient for an assault with intent to commit rape. Is the second count sufficient for an attempt to rape? Counsel for appellant contends that it is not, the objection being that as this count charges that the rape was attempted alone by threats, it should have been alleged that the threats were directed against the person of the prosecutrix. This is not necessary. See definition of "rape," Penal Code, art. 528. And further, the court must give in charge article 530 of the Penal Code, defining the threat required by the statute.

It is urged by counsel for appellant that only under an indictment for rape can the accused be convicted of an attempt to rape. We hold to the contrary. Melton v. The State, 24 Texas Ct. App., 284.

There is no duplicity in the indictment. This objection to an indictment applies when two or more distinct offenses are joined in one count. Two or more distinct offenses may, under proper circumstances, be joined in one indictment. This, however, must ordinarily be done in separate counts. In this case we have two counts—one for an assault with intent to rape, and the other for the attempt.

It appears from the record that one Felix Diaz had been in attendance upon the court at the trial term as a witness for the defendant in obedience to a subpoena until August 1. Neither the witnesses for the State nor defendant being present, an attachment was issued and executed on the 2d day of August. When the parties were called upon to announce the sheriff stated to counsel for defendant that Diaz had been attached

and would be in attendance upon the court. Counsel for defendant believing this to be true announced ready for trial. Diaz did not attend, and defendant being convicted brings forward this matter as a ground for new trial, stating in the motion the facts expected to be proved by Diaz.

Conceding for the argument the materiality of the facts, still the court did not err in refusing a new trial upon this ground, because at some time before the evidence was concluded the appellant discovered that Diaz was not present, if in fact he needed him. Now, under this state of case it was the duty of appellant to move to withdraw his announcement, and to continue or postpone the case, setting out in his motion all the facts as well as the testimony expected from Diaz. This rule of practice is well settled.

The motion for new trial relied upon testimony discovered after the trial. From an inspection of the record it clearly appears that this testimony could have been ascertained, if indeed the appellant was not aware of the facts himself. He had visited the house in company with Diaz, knew its character and its occupants, and could have procured the attendance of several witnesses who would have testified to all the facts stated in the affidavits filed in support of his motion.

There is very cogent testimony tending to show that appellant was very drunk at the time he made the attempt. The court gave in charge to the jury the statute relating to drunkenness which reads: "Neither intoxication, nor temporary insanity of mind, produced by voluntary recent use of ardent spirits, shall constitute any excuse in this State for the commission of crime, nor shall intoxication mitigate either the degree or the penalty of crime, but evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant in any criminal prosecution in mitigation of the penalty attached to the offense for which he is being tried, and in cases of murder, for the purpose of determining the degree of murder of which the defendant may be found guilty." Article 40*a*, Penal Code, Willson's Crim. Stats., sec. 92.

Appellant requested the following charge: "The jury may take into consideration the evidence before them as to the drunkenness of the defendant at the time of the assault (if any was made) in determining whether the defendant had at the time the specific intent to commit the offense of rape as that offense is defined in the charge of the court." This requested instruction was refused and the defendant excepted.

Let us return to article 40*a*. It is seen that neither insanity nor intoxication produced by the voluntary recent use of ardent spirits shall be an excuse for crime. This is the common law, and the law of common sense. Acts may be excused, but there can in the very nature of things be no excuse for *crime*. For if indeed appellant attempted to rape Mrs. Regian, in morals as in law, there is no excuse.

But it may be contended that the statute means that proof of insanity or intoxication so produced shall not be used to negative—disprove—the specific intent to ravish. The specific intent to rape must accompany the means used to effect the rape. The intent is an absolutely essential ingredient of the offense, without which, though the means may have been used, there can be no attempt to rape. Now then, has the Legislature eliminated this ingredient in all cases in which the defendant is temporarily insane from the use of ardent spirits—insane, or so drunk from the voluntary recent use of ardent spirits as to be incapable of forming the intent? If so, then the offense is complete without the specific intent—such insanity or drunkenness being substituted for the intent. We will not believe this to be the intention of the Legislature until it is expressed in plain and unquestionable language.

This we deem a correct rule, and it is well settled that if the offense consists of an act combined with a particular intent, it is as necessary to prove the intent as to prove the act, and the intent must be found by the jury as matter of fact, before a conviction can be had. Especially is this so when the offense, consisting of the act and the intent, constitutes, as in this case, an attempt to commit a higher offense than that charged. "And as the particular intent charged must be proved to the satisfaction of the jury (beyond a reasonable doubt), no intent in law, nor mere legal presumption, differing from the intent in fact, will be allowed to supply the place of the latter." Roberts v. The People, 19 Mich., 402; Rex v. Thomas, 1 East P. C., 417; 1 Leach, 330; Rex v. Holt, 7 Car. and P., 518; Cruses's Case, 8 Car. and P., 541; Rex v. Jones, 9 Id., 258; Regina v. Ryan, 2 Mood. and R., 213; Agletree v. The State, 28 Ala., 693; Maher v. The People, 10 Mich., 212; The People v. Scott, 6 Mich., 296; Loza v. The State, 1 Texas Ct. App., 488. Our statute above quoted declares that intoxication shall be no *excuse for crime*, etc. If a crime has not been committed, the statute is inapplicable. No *excuse* is needed until a *crime* has been committed.

Now, as bearing upon the question as to whether the attempt was committed with the intent to ravish, it was material to inquire whether the defendant's mental faculties were so far overcome by the effects of intoxication as to render him incapable of entertaining the intent, and for this purpose it was the right and duty of the jury to take into consideration the nature and circumstances of the attempt, the actions, conduct, and demeanor of the defendant, his declarations before, at the time of, and after the attempt, and especially to consider the nature of the attempt, and what degree of mental capacity was necessary to enable him to entertain the intent to rape.

The question we are considering relates solely to the capacity of the defendant to entertain the particular intent. It is a question rather of the exercise of the will than of reasoning powers, and as matter of law,

the jury should have been instructed that if defendant's mental faculties were so far overcome by intoxication that he was not conscious of what he was doing, or that if his actions and the means used were naturally adapted or calculated to effect his purpose, still, if he had not sufficient capacity to entertain the intent to ravish Mrs. Regian, in that event they should not infer that intent from his acts. But if he knew what he was doing, and why he was doing it, and his actions and the means used were naturally adapted or calculated to effect his purpose, then the attempt to rape might be inferred from his acts in the same manner as if he were sober.

Appellant is not to be held responsible for the intent if he was too drunk for a conscious exercise of the will to the particular end; or, in other words, too drunk to entertain the intent, and did not entertain it in fact. If he did in fact entertain it, though but for the intoxication he would not have done so, he is responsible for the intent as well as for the acts.

We are of the opinion that the requested instructions should have been given. The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.